COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    SUPERIOR COURT DEPARTMENT
                                                        OF THE TRIAL COURT
                                                        CIVIL ACTION NO. 04-02552

|  |  |
|---|---|
| WORLD WIDE MEDICAL TECHNOLOGIES, LLC., and ADVANCED CARE PHARMACY, INC.<br><br>Plaintiffs,<br><br>v.<br><br>ANTHONY D. BISCOTTI<br>NUCLEAR CONSULTANTS GROUP, INC, and<br>DANA TOMASZEWSKI<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF ANTHONY D. BISCOTTI

1. My name is Anthony D. Biscotti and I am an adult resident of the Commonwealth of Massachusetts and a named defendant in the above-captioned matter.

2. I am the President of Nuclear Consultants Group, Inc. ("NCG"), a Delaware corporation I formed in March, 2004 shortly after I separated from the above-referenced plaintiff, Advanced Care Pharmacy ("ACP").

3. I have over fifteen years of experience as a pharmacist and over ten years of experience in the nuclear pharmacy field.

4. I have been a licensed nuclear pharmacist in Massachusetts since January 1994.

5. I had substantial nuclear pharmacy experience prior to providing consulting services to the plaintiff World Wide Medical Technologies, LLC ("WW").

6. Specifically, from 1993 through April 2002, I served as the Senior Staff Nuclear Pharmacist, Nuclear Pharmacy Manager and Radiation Safety Officer at Syncor International Corporation in Woburn, Massachusetts ("Syncor").

7. My duties and responsibilities at Syncor were quite extensive and the substantial knowledge and experience I gained at Syncor was put to use for the benefit of WW and ACP. Among my Syncor duties were the following:

- Overall operations management, including quality assurance, staff management, fleet management, and distribution;

- Identification and management of real estate and capital assets necessary to optimize nuclear pharmacy operation profitability and productivity;

- All aspects of constructing a new nuclear pharmacy site, including site selection; site reviews with the Massachusetts Board of Health Division of Radiation Control; capital asset selection and purchasing; space planning; daily meetings with the general contractor to assure Syncor standards and time lines were met and; conducting closeout surveys and related paperwork required for the decommissioning of the old site;

- Preparing patient-specific and/or custom radioactive agents and facilitating expedited and sometime urgent delivery to area hospitals

- Development and tracking of an annual budget including attainment of sales and expenses objectives, through effective financial management;

- Ensuring the safety and security of the pharmacy was consistently in accordance with federal, state and local regulations;

- Human resource management of all lab personnel, including staff pharmacists, relief staff pharmacists, Customer Service Supervisor, lab technologists, customer service assistants, interns, and administrative secretaries and insuring 24 hour staffing of the nuclear pharmacy;

- The preparation of radioactive kits and doses, including the labeling of human blood cells with TC-99 and In 111 OX, for distribution to hospitals and other clinical settings;

- Performing quality control measures and maintaining radiation safety records on radioactive kits produced in the laboratory;

- Providing in-services to Syncor customers, as well as, lectures to nuclear medicine technician students;

- Functional management of day to day operations, including trouble-shooting customer

and staff issues.

8. In or about February 2002, I engaged in discussions with Gary Lamoureux, WW's President, about assisting WW in establishing a nuclear pharmacy in Massachusetts.

9. The Defendants' assertion in their Complaint that I had "no knowledge or training in the field of brachytherapy and radioactive seeds" is patently false. Mr. Lamoureux, indicated that my knowledge and experience in the field made me particularly well-suited to lead WW's effort to create a Massachusetts nuclear pharmacy.

10. I left Syncor for and began consulting with WW in or about April 2002. Prior to commencing my consulting duties with WW I executed the confidentiality agreement attached to the Defendants' Complaint as Exhibit A (the "NDA"). The parties did not negotiate the NDA. Rather, WW presented me with the NDA and told me to immediately sign the agreement. I barely had time to review the agreement, let alone consult with an attorney, of which WW is aware.

11. WW hired me to direct their efforts to establish a nuclear pharmacy in Massachusetts to handle radioactive "Brachytherapy seeds" which were to be used in the treatment of prostate cancer. Brachytherapy is a form of prostate cancer radiation therapy whereby tiny radioactive "seeds" are stranded together and loaded into brachytherapy needles, or "loaded loose" into brachytherapy needles, sterilized and injected into the prostate gland. The number of seeds, type of radioactive isotope and loading form -- whether loose or stranded -- of the seeds is dictated by the treating physician.

12. When I commenced my WW engagement, I understood that WW utilized a stranding method which it protected and to which I was never privy. I was also never exposed to

any needle, loading or plugging methods while at WW. Any exposure to these methods and procedures was purely fleeting.

13.     At the onset of my WW engagement, Gary Lamoureux, WW's President, shared with me a videotape he "acquired" from his former partner, Custom Care Pharmacy, Inc., located in Florida ("Custom Care").

14.     The videotape was essentially a "step-by-step" instructional guide on how to load perform quality control, sterilize and ship brachytherapy seeds. The videotape also showed the interior of Custom Care's nuclear pharmacy and its working personnel.

15.     Mr. Lamoureux indicated to me that he wanted me to utilize the tape in constructing a nuclear pharmacy for WW.

16.     During my eight-month WW engagement, I primarily worked out of my home in Acton. I visited WW's Connecticut headquarters on rare occasion but, other than passing through the building where seed stranding and needle loading was conducted, was never exposed to anything relating to WW's seed stranding, sterilization, loading, packaging or shipping. I did not have keys to any WW facilities nor access to its computer systems. I also was not provided with WW's "Good Manufacturing Practice" procedure which is a detailed guide regarding how WW builds its strands, plugs its needles, etc.

17.     Rather, my duties and responsibilities centered on the establishment of the Massachusetts nuclear pharmacy, including, but not limited to site selection, lease negotiation, obtaining permits and licenses from regulatory bodies, purchasing office furnishings and equipment, hiring staff and, once the Maynard site was selected, training Maynard Fire Department personnel in radiation safety and emergency response. All information I received from WW was familiar both to me and/or known in the industry.

18. I provided Mr. Lamoureux with $20,000 in consideration for his agreement to provide me with 5% of the ownership of the company to be established in Massachusetts. Mr. Lamoureux and I also agreed that I would receive an additional 5% ownership stake in the company for each year of my employment with the company (not to exceed 30%) as "sweat equity". Mr. Lamoureux and I agreed that the new company would be called Advanced Care Pharmacy, Massachusetts ("ACP").

19. I understood that ACP was a separate and distinct corporate entity from WW. I had and still have no knowledge of the legal corporate relationship between WW and ACP, if any. I had and have no knowledge of any "licensing agreement" between the entities.

20. In late 2002 ACP commenced doing business. I commenced employment with ACP, as an employee rather than an independent contractor, on January 1, 2003. My title was Director of Pharmacy Operations. I never executed a confidentiality, non-disclosure, non-solicitation, non-competition or other restrictive agreement with ACP.

21. I oversaw the management of ACP's pharmacy and handling of brachytherapy materials. Specifically, at ACP's Maynard facility my staff and I tested stranded and non-stranded seeds, loaded the seeds into ACP's patented pre-plugged needles and sterilized the seeds. We conducted quality control and ensured that the end-user specifications were met, then packaged and shipped the seeds to the end user.

22. No stranding of seeds was ever conducted at ACP's Maynard facility. Rather, all stranding took place at a company called ACP, Connecticut. Mr. Lamoureux indicated that ACP, Connecticut's stranding technique was confidential and proprietary and would not be shared with ACP, Massachusetts. Therefore, I was never fully exposed to the stranding technique utilized in ACP products.

23. ACP's pre-plugged needle is one of two types of pre-plugged brachytherapy needles available on the commercial market, although numerous non-plugged brachytherapy needles are available from several companies.

24. Moreover, the "pre-loading" of needles pre-dates ACP's creation and was used by hospitals such as Boston's Beth Israel Hospital, which developed a method for pre-loading seeds into needles with bone wax, then sterilizing the same for immediate use in its operating rooms.

25. As part of my duties, I remained updated on industry technology and suggested such technology to Mr. Lamoureux. For example, I became aware of the development of a sterilization technique called "parametric release" which was well-known in the industry. I have appended hereto as Exhibit 1 materials describing parametric release from 1996. I suggested parametric release as a method for cutting sterilization time in half, thereby dramatically improving turnaround time to our customers.

26. I was also responsible for completing "customer complaint logs" which recorded each "error" made by ACP, Connecticut in the stranding of the seeds or processing of seed orders. Every time ACP, Connecticut sent ACP, Massachusetts defective or inaccurate product, the error must be logged. I informed Mr. Lamoureux that most of the errors were caused by loading mistakes and that it made more sense to load seeds in Massachusetts, where testing also occurred.

27. Mr. Lamoureux, however, indicated that the loading would continue to be conducted in Connecticut for security purposes.

28. During the course of 2003 my relationship with Mr. Lamoureux became strained due, in large part, to Mr. Lamoureux's refusal to issue to me stock certificates documenting my 5% ownership interest in ACP.

6

29. By the fall of 2003 Mr. Lamoureux indicated an unwillingness to issue the stock certificates to me or even provide me with a reasonable stockholder agreement.

30. Finally, by the end of 2003, our relationship deteriorated to the breaking point. Mr. Lamoureux refused to provide me with a reasonable stockholder agreement or even to return my $20,000 capital investment.

31. Finally, Mr. Lamoureux offered to return my $20,000 investment, which he was obligated to do in any event, in return for my agreement to, among other things, disclaim any ownership interest in the company.

32. During January 2004 Mr. Lamoureux and I, through our attorneys negotiated an agreement for the return of my investment. Mr. Lamoureux's attorneys drafted the agreement forwarded the agreement to me for signature and, on or about February 3, 2004 I accepted their offer and executed the agreement.

33. The Agreement, a true and accurate (but unsigned version) copy of which is appended hereto as Exhibit 2 provided in part as follows:

> 1. The Letter Agreement, and *every other document, agreement or instrument previously provided to you, signed or unsigned, relating to your proposed ownership of ACP or your employment with ACP, including without limitation, a non-binding letter of intent and a Stockholder's Agreement, are hereby terminated, void, of no further force and effect.* In the event of a conflict between this Agreement and the Letter Agreement, this Agreement shall control.

34. During the course of the negotiations relating to this agreement, counsel for ACP and WW confirmed to my attorney that I was not bound by any agreement whatsoever and would be required "as a condition of continued employment to execute . . . standard documents relating to confidentiality and non-compete.

7

35. I never executed a confidentiality, non-disclosure, non-solicitation or non-competition agreement with ACP.

36. Because my relationship with Mr. Lamoureux was irreparably damaged due to his repeated misrepresentations, I resigned my employment on or about February 5, 2004.

37. I attempted to end my relationship with ACP on the best terms possible, given the hardship caused by Mr. Lamoureux breaches of representations to me. I offered to remain at the work site for nearly two weeks after my resignation notice to aid in the transition. I even contacted two nuclear pharmacists to inform them of the opening at ACP.

38. Despite my offer, on February 10, 2004, ACP decided to shut the operation without notice to employees or to the Massachusetts Board of Pharmacy, as is required by law.

39. ACP attempted to brow beat employees into executing confidentiality agreements on their way out the door. ACP directed its movers to pack and remove all furnishings, equipment and other materials from ACP's offices as rapidly as possible. I frantically attempted to test all of the materials being removed from the nuclear pharmacy's restricted area for radioactive contamination, as is required by law.

40. The employees present that day packed their personal belongings and left. Because I had been so occupied with contamination testing during the day, I did not have the opportunity to gather and remove my personal property until that evening. I believe that ACP removed a significant amount of my personal equipment and other property that day. I personally handed Bruce Strawenski a small box of stranding material and a brachytherapy order form indicating the ACP seed orders that were outstanding. I specifically indicated to Mr. Strawenski that the material and information was ACP's property and that he did not want to possess them.

41. I took no property belonging to ACP when I left and currently possess no ACP property.

42. I understand that Mr. Tomaszewski, who served as ACP's Operations Specialist, took with him several computers belonging to him.

43. While I had some brief conversations with Mr. Tomaszewski in the aftermath of ACP's curious shutdown, I have not had a single conversation with Mr. Tomaszewski during the course of the last three months other than to discuss this litigation.

44. After leaving ACP I decided to start my own nuclear pharmacy consulting business. I established a corporation named Nuclear Consultants Group, Inc. ("NCG") and began to offer consulting services in March, 2004.

45. Mr. Tomaszewski is not, and never has been, an employee of NCG. Again, until the advent of this litigation, I have not communicated with Mr. Tomaszewski for approximately three months.

46. While NCG certainly provides some services that are competitive with ACP, NCG in no way incorporates or utilizes any trade secrets of ACP.

47. For example, while NCG can certainly provide customers with brachytherapy products, we do not utilize ACP's "secret" stranding techniques or their patented needles. We buy stranding material from other producers such as CP Medical, Inc., which has produced its own brand of stranding material for years. We use pre-plugged needles available from CP Medical, Inc., and employ sterilization methods, such as parametric release, which have been in the public domain for almost a decade.

48. In sum, NCG does not utilize, nor does it intend to utilize any "trade secrets" of ACP. Rather, NCG offers its customers superior attention to detail and accountability through the utilization of my decade of experience in the nuclear pharmacy field.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 30TH DAY OF JUNE, 2004.**

_____
Anthony D. Biscotti