UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WORLD WIDE MEDICAL TECHNOLOGIES, LLC, ADVANCED CARE PHARMACY, INC. GARY A. LAMOUREUX and RICHARD A. TERWILLIGER, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHONY D. BISCOTTI and NUCLEAR CONSULTANTS GROUP, INC., <br><br> Defendants. | Docket No. 04-11619-NG |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' PATENT CLAIMS**

Defendants in the above-captioned matter, Anthony D. Biscotti and Nuclear Consultants Group, Inc. (the "Defendants") hereby move this Court to dismiss Count 1 of the Complaint of the Plaintiffs in this action, World Wide Medical Technologies, LLC ("WW"), Advanced Care Pharmacy, Inc. ("ACP"), Gary Lamoureux and Richard A. Terwilliger (collectively the "Plaintiffs"). As reasons therefore, the Defendants state that the Plaintiffs have failed and/or refused to join a necessary party to this action, Ideamatrix, Inc. ("Ideamatrix") a Colorado corporation. Additionally, the Plaintiffs have failed to allege with the required degree of specificity that the Defendants have infringed on the so-called "760 Patent" and failed to conduct any patent infringement analysis prior to filing suit as required by law. The jurisdiction of this Court is completely dependent upon the patent claim and the Court should therefore remand this matter to the Massachusetts Superior Court, where two of the Plaintiffs originally initiated the action.

**FACTUAL AND PROCEDURAL BACKGROUND**

The relevant facts related to this action may be found in the Defendants' Counterclaims. Many additional facts set forth below are gleaned from the Affidavit of Anthony Biscotti, which Affidavit was filed in a case initially filed by ACP and WW against the Defendants in Massachusetts Superior Court in or about July, 2004. That Affidavit is appended hereto as Exhibit 1.

Mr. Biscotti commenced his relationship with WW as a consultant in or about April 2002. WW engaged Mr. Biscotti as an independent contractor to direct its efforts to establish a nuclear pharmacy in Massachusetts to handle radioactive brachytherapy seeds for the treatment of prostate cancer. During Mr. Biscotti's eight-month WW engagement, he primarily worked out of his Acton home and his duties and responsibilities centered on the establishment of the nuclear pharmacy. Exhibit 1. WW never allowed Mr. Biscotti access to any of its trade secrets or confidential information during his brief WW tenure; rather, all information he received from WW was familiar to Mr. Biscotti prior to his WW engagement and/or well-known in the industry. Exhibit 1. Mr. Biscotti commenced employment with ACP on January 1, 2003 and his title was Director of Pharmacy Operations. Mr. Biscotti never executed a confidentiality, non-disclosure, non-solicitation, non-competition or other restrictive agreement with ACP. Exhibit 1.

As Director of Pharmacy Operations, Mr. Biscotti oversaw the management of ACP's pharmacy and handling of brachytherapy materials. These materials typically consisted of radioactive brachytherapy seeds to be implanted into the prostate of a patient suffering from prostate cancer by the use of a specialized, but commercially available needle. Exhibit 1. These seeds are often stranded together at alternating intervals (dictated by the treating physician) using commercially available materials. The needles are "plugged" to keep the seeds from falling out

of the bottom of the needle (the cannula), typically with bone wax.  At ACP's Maynard facility, Mr. Biscotti and his staff tested stranded and non-stranded seeds, loaded the seeds into ACP's pre-plugged needles and sterilized the seeds.  Exhibit 1.  They conducted quality control and ensured that the end-user specifications were met, then packaged and shipped the seeds to the end user.  ACP's pre-plugged needle is one of several types of pre-plugged brachytherapy needles available on the commercial market and numerous non-plugged brachytherapy needles are available from several companies.  Exhibit 1.  The "pre-loading" of needles pre-dates ACP's creation and was used by hospitals such as Boston's Beth Israel Hospital, which developed a method for pre-loading seeds into needles with bone wax, then sterilizing the same for use in its operating rooms.  Exhibit 1.

During the course of 2003 Mr. Biscotti's relationship with Mr. Lamoureux became strained due, in large part, to Mr. Lamoureux's refusal to issue to Mr. Biscotti stock certificates documenting Mr. Biscotti's ownership interest in ACP.  By the end of 2003, the parties' relationship deteriorated to the breaking point.  Exhibit 1.  During January 2004 Mr. Lamoureux and Mr. Biscotti, through their attorneys, negotiated an agreement for the return of Mr. Biscotti's investment.  During the course of the negotiations relating to this agreement, counsel for ACP and WW confirmed to Mr. Biscotti's attorney that Mr. Biscotti was not bound by any agreement whatsoever and that ACP would require Mr. Biscotti "as a condition of continued employment to execute . . . standard documents relating to confidentiality and non-compete."  Exhibit 1.  Again, Mr. Biscotti never executed a confidentiality, non-disclosure, non-solicitation or non-competition agreement with ACP or WW and he resigned his employment on or about February 5, 2004.  Exhibit 1.

ACP shut its Massachusetts operation without notice to employees or to the Massachusetts Board of Pharmacy, as is required by law. Mr. Biscotti took no property belonging to ACP when he left and currently possesses no ACP property. He established a corporation called Nuclear Consultants Group, Inc. ("NCG") and began to offer consulting services upon his separation from ACP. Exhibit 1. ***While NCG certainly provides some services that are competitive with ACP or WW, NCG in no way incorporates or utilizes any trade secrets of ACP or WW.*** For example, while NCG can certainly provide customers with brachytherapy products, NCG does not utilize ACP's "secret" stranding techniques or any of the Plaintiffs' patented needles. NCG instead buys stranding material from other producers such as CP Medical, Inc., which has produced its own brand of stranding material for years. Exhibit 1. ***NCG is not currently, and never has manufactured pre-loaded, pre-plugged brachytherapy needles***.

In fact, the Plaintiffs, in their Complaint do not allege with any specificity that the Defendants are manufacturing or selling pre-plugged, pre-loaded brachytherapy needles in a manner which violates any of their patent rights. See Complaint. ***The Plaintiffs' entire patent infringement claim is premised on the fact that "one of World Wide's customers, North American Scientific, Inc., received a brochure from Biscotti's new company in which he identified the exact products and services he intends to provide."*** Complaint at ¶ 57. The services offered in the brochure, however, do not remotely suggest infringement or intended infringement of the Plaintiffs' "760 Patent" -- a particular pre-plugged brachytherapy needle. Complaint, Exhibit 3. Rather, the brochure states that NCG "can work with you to add any of the following products and services: . . . sterilization and packaging of custom products." Complaint, Exhibit 3. From this innocuous marketing statement, the Plaintiffs make the

4

incredible leap, contending that this single statement evidences an offer to provide "customers of the Plaintiffs to manufacture and create pre-plugged, pre-loaded needle kits – and thereby contributing to and/or actively inducing others to engage in such activities, in infringement of one or more claims of the "760 Patent" in violation of one or more sub-paragraphs of 35 U.S.C. § 271."[1]  Complaint at ¶ 60.

The Defendants have recently learned that the Plaintiff, Richard A. Terwilliger, assigned all of his rights to the '760 Patent to Ideamatrix nearly two years ago.  Specifically, on December 9, 2003, Mr. Terwilliger sold, assigned, transferred and otherwise conveyed his "entire right, title and interest in and to the [the '760] PATENT PROPERTY" to Ideamatrix.  See "Inventor to Corporate Assignment of Patents, Applications, and Inventions" appended hereto as Exhibit 2.  The assignment specifically includes among the "PATENT PROPERTY" "the right to sue for and [sic] all claims for damages, profits or other recovery resulting from infringement." Id.

Ideamatrix is not a party to this action.  It is unknown whether Ideamatrix has refused to participate in this action – perhaps out of fear of incurring Rule 11 sanctions – or whether the Plaintiffs' purposely or negligently failed to seek Ideamatrix's participation.  Certainly the Plaintiffs' negligent failure to seek Ideamatrix's participation in this matter would evidence the Plaintiffs' utter lack of any infringement analysis or credible investigation into whether the Defendants have infringed on the '760 Patent.

---

[1] Several months after the Defendants commenced doing business, two of the Plaintiffs – WW and ACP -- brought legal action against Mr. Biscotti and another former ACP employee in Middlesex (Massachusetts) Superior Court in June, 2004 (the "Massachusetts Action").  The Plaintiffs' allegations in the Massachusetts Action were substantially similar to those alleged in the instant action, with the exception of the patent infringement claims.  The Plaintiffs sought injunctive relief from the court in the Massachusetts Action but, after a hearing on their motion for injunctive relief – during which the court expressed skepticism regarding the Plaintiffs' claims – the Plaintiffs withdrew their motion and dismissed their Complaint.  Several weeks later, the Plaintiffs filed a Complaint in this action, adding the patent infringement claims.  While they filed with this Court a Motion for Injunctive Relief and Emergency Motion for Preservation of Evidence, moreover, they submitted these motions with little support and failed to press for a determination of their "emergency" motions as the months passed.  The Court ultimately denied the Plaintiffs' Motion for Injunctive Relief.  The Court also denied the Plaintiffs' Emergency Motion for Preservation of Evidence.

**LEGAL ARGUMENT**

The Plaintiffs' patent claim (Count 1) should be dismissed because 1) the Plaintiffs have failed and/or refused to join as a necessary party to this action, Ideamatrix, and; 2) Plaintiffs have failed to allege with the required degree of specificity that the Defendants have infringed on the so-called "760 Patent" and failed to conduct any patent infringement analysis prior to filing suit as required by law.

**I.    The Plaintiffs Have Failed And/Or Refused To Join A Necessary Party To This Action, Ideamatrix**

Ideamatrix, as assignee and co-owner of the '760 Patent, is a necessary party to this action because, in its absence, complete relief cannot be accorded among the existing parties. See, e.g., Aspex Eyewear, Inc. v. E'Lite Optik, Inc., 2002 U.S. Dist. LEXIS 14834, at *24 (N.D. Tex. Apr. 4, 2002) (Exclusive sub-licensee is necessary party.); Zenith Electronics Corp. v. Exzeclnc, 876 F. Supp. 175, 179 (N.D. 111. 1995) (Holding that a party was in fact an assignee and "necessary" party.). It is black letter law that "[a]n action for infringement *must* join as plaintiffs all co-owners." Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1467 (Fed. Cir. 1998) cert denied 525 U.S. 923 (1998) (emphasis added) (citing Moore v. Marsh, 74 U.S. 515, 520 (1868) ("Where [an] assignment is of an undivided part of the patent, the action *should be brought* for every infringement committed subsequent to the assignment, i*n the joint names of the patentee and assignee,* as representing the entire interest.").

"Further, as a matter of substantive patent law, *all co-owners must ordinarily consent to join as plaintiffs in an infringement suit*.[] Consequently, 'one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit.'" Ethicon at 1467-1468 (quoting Schering Corp. v. Roussel-UCLAF SA, 104 F.3d 341, (Fed. Cir. 1997)). Indeed, in Ethicon, the United States Court of Appeals for the Federal Circuit upheld the

6

dismissal of a patent infringement action based upon the fact that the co-owner of the patent, Choi, "did not consent to an infringement suit." The Ethicon Court recognized that there existed only two exceptions to this rule, neither of which were evident in that case, which could save a patent claim from dismissal.

> Two established exceptions exist. First, when any patent owner has granted an exclusive license, he stands in a relationship of trust to his licensee and must permit the licensee to sue in his name. Second, the obligation may arise by contract among co-owners. If, by agreement, a co-owner waives his right to refuse to join suit, his co-owners may subsequently force him to join in a suit against infringers.

Ethicon at 1468 (internal citations omitted). Similarly, in the case at hand, neither of these exceptions exists: Ideamatrix is not a licensee of Terwilliger nor has it entered into any agreement with Lamoureaux. Neither of the limited exceptions exists in this case and, like the Ethicon Court, this Court should dismiss the patent claims.

Defendants' position is similarly supported by Schering Corp. v. Roussel-UCLAF SA, 104 F.3d 341 (Fed. Cir. 1997), in which the United States Circuit Court of Appeals for the Federal Circuit ruled that patent claims must be dismissed where only one of two patent owners brought suit. In Schering, the plaintiff Schering Corporation, co-owned pharmaceutical patents with Roussel UCLAF, SA. Schering sued Zeneca, Inc. for patent infringement but Roussel had previously granted a valid license to Zeneca and would not (and could not) voluntarily join Schering as a plaintiff. The U.S. District Court for the District of Delaware dismissed the patent claims, ruling that without Schering's voluntary participation in the infringement suit, the patent claims could not survive. The Appeals Court affirmed, recognizing that "one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit." Schering at 345 (Also recognizing that one patent co-owner may grant an exclusive right to sue via contract with the other co-owner.).

7

Based upon the foregoing authority, the Plaintiffs *cannot* maintain their patent claims against the defendants. This Court must act as did the district courts in Ethicon and Schering and order the Plaintiffs' patent claims dismissed. See Aspex Eyewear, Inc. at 7 ("Without the patentee as plaintiff, the remedies provided in the patent statute are unavailable except in extraordinary circumstances, such as when the patentee is the infringer and cannot sue himself.") (citing Crown Die & Tool Co. v. Nye Tool & Mach. Works, 261 U.S. 24, 40-41, (1923) (Holding that plaintiff must have legal title to patent at time of infringement, upholding district court dismissal of suit)).[2]

## II. **Plaintiffs' Failure to Conduct Pre-Suit Investigation Requires Dismissal of this Action**[3]

Where, as is the case here, a party has asserted a patent claim without first conducting a thorough pre-suit investigation the patent claims must be dismissed. Federal Rule of Civil Procedure 11 ("Rule 11") states that "[b]y presenting to the Court . . . a pleading . . . an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*, . . . the allegations and other factual contentions have evidentiary support." Rule 11 (emphasis added). In the context of patent infringement actions, Rule 11 requires, at a minimum, "that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." Q-Pharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295, 1300-01 (Fed.

---

[2] As asserted infra, the Defendants also posit that the patent claims should be dismissed as the Plaintiffs' failure to seek Ideamatrix's participation as a plaintiff is substantial evidence of the Plaintiffs' lack of diligence in analyzing the infringement claim prior to the initiation of the lawsuit.

[3] The Defendants initially filed a motion to dismiss and for Rule 11 Sanctions in a single pleading seeking both the dismissal and imposition of Rule 11 Sanctions. Plaintiffs' counsel brought to the Defendants' attention the fact that the initial pleading did not comply with Federal Rule of Civil Procedure 11(C)(1)(A) requiring a separate pleading for a Motion for Rule 11 sanctions as well as particular service and filing requirements. The Defendants subsequently withdrew their original motion to dismiss and for Rule 11 sanctions and now file a motion to dismiss and memorandum in support of motion to dismiss independent from their Motion for Rule 11 Sanctions.

8

Cir. 2004); accord View Eng'g, Inc. v. Robotic Vision Sys., Inc., 208 F.3d 981, 986 (Fed Cir. 2000) (Affirming the district court's imposition of Rule 11 sanctions where counsel had "performed neither a formal nor an informal analysis of any sort" and thus failed to conduct a "reasonable inquiry for the purpose of filing patent infringement claims."). "The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case." Id.; see also Q-Pharma, 360 F.3d at 1302 (Observing that "our case law makes clear that the key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis.").

> The basis for this requirement is clear,
>
> A patent suit can be an expensive proposition. Defending against baseless claims of infringement subjects the alleged infringer to undue costs -- precisely the scenario Rule 11 contemplates. Performing a pre-filing assessment of the basis of each infringement claim is, therefore, extremely important.  In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement. Failure to do so should ordinarily result in the district court expressing its broad discretion in favor of Rule 11 sanctions, at least in the absence of a sound excuse or considerable mitigating circumstances.

Wald v. Inv. Tech. Group, Inc., 2004 U.S. Dist. LEXIS 22449 (S.D.N.Y. 2004) (quoting View Eng'g, Inc. at 986.  A court may dismiss patent claims based upon a failure to conduct a proper pre-suit analysis even if ultimately determining not to impose Rule 11 sanctions. Classen Immunotherapies, Inc. v. Biogen Idec, 381 F. Supp.2d 452, 457-458  (D. Md. 2005) (Court declines to impose Rule 11 sanctions where dismissal of patent claims "should be sufficient to discourage [Plaintiff] from filing additional pleadings before conducting a reasonable prefiling inquiry.").

Here, the Plaintiffs appear to have performed no infringement analysis at all.  Their Complaint is completely bereft of any reference to any patent analysis.  As indicated above, ***the***

9

*Plaintiffs failed to even ascertain the identity of the patent owners prior to filing suit*.  The Complaint is also bereft of an allegation that the Defendants directly infringed on their alleged patent rights.  As indicated above, *the Plaintiffs' entire patent infringement claim is premised on the assertion that "one of World Wide's customers, North American Scientific, Inc., received a brochure from Biscotti's new company in which he identified the exact products and services he intends to provide."*  The services offered in the brochure do not even suggest infringement – or intended infringement – of the Defendants' '760 Patent.  Rather, the brochure states that NCG "can work with you to add any of the following products and services: . . . sterilization and packaging of custom products."  As set forth above, the Plaintiffs have based their entire patent infringement claim on this unobjectionable marketing statement, contending that this single statement evidences an offer to provide "customers of the Plaintiffs to manufacture and create pre-plugged, pre-loaded needle kits – and thereby contributing to and/or actively inducing others to engage in such activities, in infringement of one or more claims of the "760 Patent" in violation of one or more sub-paragraphs of 35 U.S.C. § 271."  <u>Complaint</u> at ¶ 60.

      Significantly, the Plaintiffs have failed to even allege that any of their customers have been aided by the Defendants in the manufacture or creation of particular pre-plugged needles thereby infringing on the '760 Patent.  Indeed, such assistance from the Defendants is unnecessary as a competitor or customer need only obtain the publicly-available patent design, description and detail to create an infringing needle.  Again, *the Plaintiffs have absolutely failed to even allege that the Defendants aided any third party in creating a product that infringes on the '760 patent.*  The Plaintiffs have, instead, based their entire claim on the Defendants' vague and innocuous marketing materials.

10

Courts have dismissed patent claims in cases, such as this, in which a plaintiff, in prosecuting a patent claim, failed to identify the proper parties to a suit or to identify, with specificity and precision the process or device by which the defendant infringed.  The recent case <u>Classen Immunotherapies, Inc. v. Biogen Idec</u>, 381 F. Supp.2d 452, 457-458  (D. Md. 2005) is instructive.  The <u>Classen</u> Court dismissed patent claims – but decided not to impose Rule 11 sanctions – where a plaintiff, in an attempt to name the proper "Kaiser" entity, named entities which did not exist or which did not administer vaccines, the alleged infringing conduct.  <u>Id</u> at 456-457.  The <u>Classen</u> Court noted that determining "with accuracy that they are suing the correct parties . . . is the most basic factual inquiry in any lawsuit."  <u>Id</u> at 457 (<u>quoting</u> <u>Callahan v. Schoppe</u>, 864 F.2d 44, 46-47 (5th Cir. 1989).  In the case at hand, the Plaintiffs have failed to ascertain the identity *of the patent owners*.

The <u>Classen</u> Court also noted that the Defendants asserted that the Plaintiff had failed to identify the infringing "protocol" allegedly undertaken by the defendants.  The Court stated:

> in patent infringement cases, a party conducting a prefiling inquiry must [] "at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused [practice] and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted."

<u>Id</u> (<u>quoting</u> <u>View Eng'g</u> at 986).  A party may not, moreover, base a pre-litigation investigation upon simple marketing materials of the alleged infringer and on lay opinion, as the Plaintiffs have here.  <u>See</u> <u>Network Caching Tech., LLC v. Novell, Inc.</u>, 2003 U.S. Dist. LEXIS 9881, 18 (N.D. Cal. Mar. 21, 2003) ("While these [marketing] materials do contain some level of technical discussion . . . looking at these indirect sources of information *fails to satisfy the pre-filing investigation requirements* described both by <u>View Eng'g</u> and the court's previous order.") (emphasis added).

In the case at hand, the ***Plaintiffs did not*** ascertain the proper plaintiffs, ***Plaintiffs did not*** obtain marketing materials with "technical discussion" and ***Plaintiffs did not*** obtain an allegedly infringing product. Had they obtained an infringing product (perhaps from their customer North American Scientific, Inc.), assuming for illustration only that there were any such products, they would have then been required to "reverse engineer" or ***at least*** analyze the product. The Plaintiffs would then have been required to demonstrate a nexus between the Defendants' activities and the infringing product. The Plaintiffs have utterly failed to perform any of these pre-filing activities. Their patent claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be allowed.

>Respectfully Submitted,
>
>ANTHONY D. BISCOTTI and
>NUCLEAR CONSULTANTS
>GROUP, INC.
>
>By their attorneys,
>
>
>_____/S/\_\_\_\_John F. Tocci_____
>John F. Tocci, Esq., BBO# 562139
>Tocci, Goss & Lee, P.C.
>35 India Street, 5th Floor
>Boston, MA  02110
>(617) 542-6000

Dated: December 12, 2005