UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WORLD WIDE MEDICAL
TECHNOLOGIES, LLC, ADVANCED
CARE PHARMACY, INC., GARY A.
LAMOUREUX, AND RICHARD A.
TERWILLIGER,
        Plaintiffs,

v.

ANTHONY D. BISCOTTI AND
NUCLEAR CONSULTANTS GROUP,
INC.
        Defendants.

CIVIL ACTION NO.: 04-11619-NG

## MOTION TO AMEND THE COMPLAINT TO
## JOIN IDEAMATRIX, INC. AS A PLAINTIFF

Plaintiffs, World Wide Medical Technologies, LLC ("World Wide"), Advanced

Care Pharmacy, Inc. ("ACP"), Gary A. Lamoureux ("Lamoureux"), and Richard A.

Terwilliger ("Terwilliger"), by and through their undersigned counsel, Devine, Millimet

& Branch, P.A., hereby move, pursuant to Fed. R. Civ. P. 19, to join IdeaMatrix, Inc.

("IdeaMatrix") as an involuntary plaintiff. Attached hereto as Exhibit A is Plaintiff's

Amended Complaint for Patent Infringement, Breach of Non-Disclosure Agreement, and

Theft of Trade Secrets. In support of their Motion to Amend, Plaintiffs state as follows:

## Argument

On or about July 20, 2004, Plaintiffs commenced this action based upon patent

infringement, breach of an express non-disclosure agreement, misappropriation of trade

secrets and confidential business information, fraud, intentional interference with

customers, and unfair and deceptive business practices.

On or about February 11, 2005, Defendant, Anthony D. Biscotti ("Biscotti") and his company, Nuclear Consultants Group, Inc. ("NCG"), filed an Answer and Counterclaim. Shortly thereafter, Plaintiffs commenced discovery and propounded interrogatories and document requests. Before responding to said discovery requests, Defendants filed a motion to dismiss Plaintiffs' patent claim, primarily on the grounds that Plaintiffs have "failed and/or refused to join a necessary party to this action, IdeaMatrix." Specifically, Defendants allege that they "recently learned that the Plaintiff, Richard A. Terwilliger, assigned all of his rights to the '760 Patent to IdeaMatrix nearly two years ago." (Defendants' Memo., p. 1). As a result, Defendants seek to dismiss the patent claim based on IdeaMatrix's absence.

To the extent that IdeaMatrix is a "necessary party," as Defendants suggest, Fed. R. Civ. P. 19 provides a mechanism by which IdeaMatrix may be joined as a party. Under Fed. R. Civ. P. 19(a), "a person must be joined if 'complete relief cannot be accorded among those already parties,' or if a decision in the case may make 'persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations.'" Radionics v. Elekta Instrument, 1994 WL 175028 (D. Mass. 1994).

In this case, IdeaMatrix may be joined as a party. IdeaMatrix is subject to service of process and its joinder will not deprive this Court of jurisdiction, which rests upon federal question jurisdiction. Moreover, following receipt of Defendants' motion to dismiss, IdeaMatrix was invited to become a voluntary party. For reasons that have nothing to do with the merits of this litigation, namely whether Defendants have engaged in patent infringement, IdeaMatrix has refused to join. Accordingly, if the Court

{14154\69301\A0105961.1}

2

determines that IdeaMatrix is a necessary party under Fed. R. Civ. P. 19, Plaintiffs respectfully request that it order that IdeaMatrix be joined as an involuntary plaintiff. See Katz v. Lear Siegler, Inc., 909 F.2d 1459 (Fed. Cir. 1990); Zenith Electronics Corp. v. Exzec, Inc., 876 F. Supp. 175 (N.D. Ill. 1995).

Respectfully submitted,

WORLD WIDE MEDICAL
TECHNOLOGIES, LLC, ADVANCED
CARE PHARMACY, INC., GARY A.
LAMOUREUX AND RICHARD A.
TERWILLIGER

By their Attorneys,

 /s/ George R. Moore
George R. Moore, BBO #656102
Mark J. Sampson, BBO #552808
DEVINE, MILLIMET & BRANCH, PA
300 Brickstone Square, P.O. Box 39
Andover, MA  01810
(978) 475-9100

## CERTIFICATE OF SERVICE

I, George R. Moore, hereby certify that a true copy of this document was served upon the attorney of record for each party by United States First Class Mail, postage prepaid, on February 3, 2006.

 /s/  George R. Moore
George R. Moore, BBO #656102

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WORLD WIDE MEDICAL
TECHNOLOGIES, LLC, ADVANCED
CARE PHARMACY, INC., GARY A.
LAMOUREUX, RICHARD A.
TERWILLIGER, AND IDEAMATRIX,
INC.,
       Plaintiffs,

v.

ANTHONY D. BISCOTTI AND
NUCLEAR CONSULTANTS GROUP,
INC.
       Defendants.

CIVIL ACTION NO.: 04-11619-NG

## AMENDED COMPLAINT FOR PATENT INFRINGEMENT, BREACH OF NON-DISCLOSURE AGREEMENT, AND THEFT OF TRADE SECRETS

Plaintiffs, World Wide Medical Technologies, LLC ("World Wide"), Advanced Care Pharmacy, Inc. ("ACP"), Gary A. Lamoureux ("Lamoureux"), and Richard A. Terwilliger ("Terwilliger") by and through their undersigned counsel, Devine, Millimet & Branch, P.A., and IdeaMatrix, Inc. ("IdeaMatrix") allege against the Defendants, Nuclear Consultants Group, Inc. ("NCG") and Anthony D. Biscotti ("Biscotti") (collectively, the "Defendants") as follows:

### Nature of the Case

1.      Plaintiffs bring this Complaint based upon patent infringement, breach of an express non-disclosure agreement, misappropriation of trade secrets and confidential business information, fraud, intentional interference with customers, and unfair and deceptive business practices. Plaintiffs seek preliminary and permanent injunctive relief: (1) preventing the Defendants from illegally using Plaintiffs' trade secrets and

confidential business information; and (2) preventing the Defendants from using this information to assemble pre-plugged needles using the patented and trade secret information developed by Plaintiffs; and (3) preventing the Defendants from continuing to offer for sale and market products which infringe Plaintiffs' patents and misappropriate their trade secrets and confidential information.

### Jurisdiction

2.    This action arises under the Patent Laws of the United States 35 U.S.C. §154 and §271 et seq. This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1338(a). This Court has pendent jurisdiction over the state court claims pursuant to 28 U.S.C. §1367(a).

### Venue

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b) and (c), and 28 U.S.C. §1400(b). Defendant Biscotti resides in this judicial district pursuant to 28 U.S.C. §1391(a). Defendant NCG resides in this judicial district pursuant to 28 U.S.C. §1391(c) and within the meaning of 28 U.S.C. §1391 (a)(1) and (b)(1), in that it is a corporation and is subject to personal jurisdiction in this judicial district.

### Parties

4.    Plaintiff, World Wide, is a limited liability company duly organized under the laws of the State of Connecticut, with a principal place of business in Oxford, Connecticut.

5.    Plaintiff, ACP, is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with a principal place of business in Maynard, Massachusetts.

{14154\69301\A0105948.1}

2

6.    Plaintiff, Lamoureux, is an individual residing at 373 Old Sherman Hill Road, Woodbury, Connecticut, 06790.

7.    Upon information and belief, IdeaMatrix is a Colorado corporation with a principal place of business at 255 Park Lane, Suite 203, Estes Park, Colorado 80517, that may be served with process by serving Terwilliger at the same address.

8.    Plaintiff, Terwilliger, is an individual residing at 16 Three Mile Hill Road, Middlebury, Connecticut, 06762.

9.    Defendant, Biscotti, upon information and belief, is an individual residing within the Commonwealth of Massachusetts at 5 Robinwood Road, Acton, Massachusetts.

10.    Defendant, NCG, upon information and belief, is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 5 Robinwood Road, Acton, Massachusetts, the home address of Biscotti.

### Factual Background

11.    In 1996, World Wide was founded and since that time as been developing medical device technology. To date, World Wide has over twenty (20) patents that have been issued or pending covering a number of its products. In addition, to its patented technology, World Wide has developed, through painstaking research and effort, certain trade secrets by which its product designs are brought and delivered to its customers. For example, in the field of brachytherapy, World Wide has developed "Readi-Load™" technology which has revolutionized this market.    Brachytherapy is the field of the implantation of radioactive elements ("seeds") into the body for treating cancer, referred

{14154\69301\A0105948.1}

3

to as "brachytherapy." A typical application of brachytherapy is in the treatment of prostate cancer.

12.    World Wide's Readi-Load™ system is embodied by United States Patent No. 6,554,760, entitled PRE-LOADED NEEDLE ASSEMBLY, ("the '760 Patent"), which was duly and legally issued by the United States Patent and Trademark Office on April 29, 2003, naming as inventors Plaintiffs, Gary A. Lamoureux and Richard A. Terwilliger. A certificate of correction to the '760 Patent was issued on November 25, 2003. A true copy of the '760 Patent, as printed and issued by the United States Patent and Trademark Office, together with the November 25, 2003 certificate of correction, is appended as Exhibit A to this Complaint and made a part hereof. The '760 Patent currently is, and at all relevant times in the past has been, in full force and effect. The '760 Patent is jointly owned by Plaintiffs Lamoureux and Terwilliger, and World Wide is the exclusive licensee there-under.

13.    Subsequent to the commencement of this action, it was learned that Terwilliger had purportedly assigned to IdeaMatrix an undivided interest in the '760 Patent. Upon information and belief, Terwilliger is the owner of and controls IdeaMatrix. As a nominal owner of an interest in the '760 Patent, Terwilliger, on behalf of IdeaMatrix, has consented to be joined in suits for infringement of the patent.

14.    In the invention of the '760 Patent, there is described a "pre-plugged" needle for use in implanting radioactive elements. More particularly, the invention provides a needle in which the exit end bore contains within it a "plug," of any suitable biocompatible material, which is placed at a predetermined distance from the needle exit end. The needle may then be loaded with radioactive seeds and spacers, or with stranded,

linked or otherwise connected spaced seeds, and used for implantation, during which the plug is urged out of the needle along with the seeds and spacers.

15.    The advantages of the invention of the '760 Patent over the prior art needle loading methods employed by hospital personnel are many. Principally, the use of a plug which is placed at a *defined,* predetermined distance within the needle bore end – in contrast to the prior art practice of plugging the needle end in a manner which results in a *variable* and *uncontrolled* extent of plugging material within the needle bore end area – means that the desired predetermined placement of seeds and spacers within the needle to produce a specific implantation array and pattern of seeds in the prostate can be achieved with exactitude rather than the imprecision occasioned by the prior art variable degree of incursion of a plugging material into the needle bore. Still further, by providing a "pre-plugged" needle, the invention enables completely different approaches to loaded needle preparation. For example, in situations in which a hospital physicist or oncologist is still to be employed to load the seeds and spacers (or stranded, linked or otherwise connected spaced seeds) into the needle, the provision of the pre-plugged needle relieves such person of the time and effort involved in plugging the needle (which, as earlier noted, was fraught with imprecision). Still more fundamentally, the ability to provide a pre-plugged needle enables the needle loading to be taken out of the hospital's hand altogether, at great savings of time and effort. In particular, it is now possible to prepare for hospitals and doctors *fully loaded* needles. The doctors can provide to a manufacturer and/or nuclear pharmacy the requisite information regarding the number of seeds required and the specific seed pattern sought to be obtained on implantation for the particular patient in question. Based on this information, the required numbers of loaded

and pre-plugged needles can be prepared for delivery to the hospital, with all the correct number and placement of seeds, and *in sterile form*, such that the doctor can proceed to implantation without any need for hospital staff to prepare the loaded needles, handle radioactive seeds, sterilize the individual components and attempt to assemble them while maintaining sterility of the complete assembly.

16.    Since its inception, World Wide has gone to great lengths and considerable expense to defend its patents and to protect its trade secrets, including, confidential and proprietary information. Among other things, World Wide requires all employees (temporary and permanent) and contractors to sign agreements protecting World Wide's intellectual property and trade secrets. Indeed, World Wide consistently reminds its employees and contractors of the critical importance of protecting its confidential and proprietary information.

17.    Furthermore, World Wide requires every visitor to any of its facilities to sign a Non-Disclosure Agreement prior to entering the facility and any dissemination of information is on a "need to know" basis.

18.    In addition to these contractual safeguards, World Wide maintains strict control of physical access to its facilities. World Wide's offices are locked at all times and within each facility, World Wide maintains a specific manufacturing area that is also locked and can only be accessed by authorized personnel with keys. Furthermore, no visitors are permitted at the facility without an escort.

19.    World Wide's computer system is also strictly monitored. World Wide's computers are served by two network servers, one that is configured to handle operation systems and another for shared folders. Access to each system is limited to authorized

personnel and only through pass codes assigned to those individuals. In addition, World Wide's computers can not be accessed externally.

<u>**Worldwide Begins Negotiations with Biscotti**</u>

20.    In February 2002, World Wide began negotiations with Biscotti to establish a nuclear pharmacy facility in Massachusetts to produce and market World Wide's products, either through World Wide or a new company owned or controlled by World Wide.

21.    At the time of the initial meeting, Biscotti said he was employed as a radio-pharmacy manager at Syncor International Corp., a company located in Woburn, Massachusetts.

22.    During the initial meeting, Biscotti stated that he was familiar with the success of World Wide's Readi-Load™ program, but had no training or knowledge in the field of brachytherapy and radioactive seeds. Biscotti stated that his expertise focused on laboratory set-up, radiation safety training, facility licensure and personal management of drug compounding.

23.    Based on Biscotti's experience in this area, World Wide stated that they would like to work with him and train him to open and operate a nuclear pharmacy to produce World Wide's products in Massachusetts.

24.    World Wide emphasized the value and sensitive nature of World Wide's intellectual property and trade secrets and advised Biscotti that further discussions could only occur after an agreement protecting this information was executed.

## Biscotti Agreed to Be Bound by His Non-Disclosure Agreement

25.    In connection with these negotiations, on or about March 25, 2002, the parties executed a Confidential Information Non-Disclosure Agreement ("NDA") which included, among other provisions, certain non-competition and non-disclosure covenants, a true and complete copy of which is attached hereto as Exhibit B.

26.    Before signing the NDA, Biscotti stated that he had reviewed the document with others, including a lawyer.

27.    Under the NDA, Biscotti acknowledged that World Wide may disclose certain Confidential Information to him and that he may not use this information for any other purpose except to carry out his work with World Wide.  Specifically, the covenant, entitled "Non-Disclosure of Confidential Information," provided that,

> Tony Biscotti agrees not to use the Confidential Information disclosed to [him] by World Wide Medical Technologies or for any purpose except to carry out his work with World Wide Medical Technologies.  Tony Biscotti will not disclose the information to third parties or to any subcontractor or consultant Tony Biscotti employs except as required and as approved by World Wide Medical Technologies in order to carry out the contemplated business.

28.    Biscotti also agreed to limited non-competition covenants.  The NDA provided that,

> Tony Biscotti may not use any Confidential Information received from World Wide Medical Technologies in order to produce a product which competes with any product offered or to be offered by World Wide Medical Technologies, or in any other way compete with the business of World Wide Medical Technologies.

29.    Furthermore, under the NDA, Biscotti agreed that he "shall not through operations of succession or otherwise place Confidential Information in the hands of a competitor of World Wide Medical Technologies."

30.    Under the terms of the NDA, Biscotti specifically acknowledged that the foregoing restrictions were necessary and reasonable in order to protect the interests of World Wide.

### World Wide Disclosed Confidential Information to Biscotti under the NDA

31.    Based on the aforementioned representations and his obligations under the NDA, Biscotti was given a comprehensive course on World Wide's business in which he was exposed to highly confidential and proprietary business and technical information. Among other things, and pursuant to the parties' efforts to establish a nuclear pharmacy in Massachusetts, World Wide disclosed its business strategy, marketing intelligence, verbal and written details about the Readi-Load™ program and products including, but not limited to, information on materials, equipment, facilities, and personnel. The confidential information disclosed to Biscotti was developed over the course of World Wide's eight (8) year history and represents thousands of hours of development work and millions of dollars in investments in capital assets and research and development costs.

32.    In apparent recognition of the value of World Wide's technology, Biscotti made a Twenty Thousand Dollar ($20,000.00) capital contribution to be held in escrow pending the execution of a shareholder agreement for the new Massachusetts company.

33.    Between April 2002 and July 2002, Biscotti's primary responsibility was to find a location for the Massachusetts facility, sourcing the equipment needed for

{14154\69301\A0105948.1}

9

radiation handling, and applying for necessary radiation licensure from state and federal agencies.

34.    During this time, Biscotti, along with other World Wide personnel, looked at a variety of properties and settled on the Clock Tower facility in Maynard, Massachusetts (the "Maynard facility").

35.    In August 2002, a lease was signed for the Maynard facility. It was determined that the Maynard facility would operate under the name of ACP, and that ACP would produce and market World Wide's products. At all times material hereto, Biscotti was fully aware of the relationship between World Wide and ACP.

### Biscotti Oversees the Set-up of the Maynard Facility

36.    Between August 2002 and October 2002, Biscotti oversaw the set-up of the Maynard facility. During this time, Rick Terwilliger, World Wide's Vice President and Technical Director, spent considerable time and effort to help set-up the facility and train Biscotti on how to handle, load and assemble World Wide's proprietary products.

37.    Significantly, while the Maynard facility was being established, World Wide, through Terwilliger, disclosed many of World Wide's trade secrets as they pertain to the manner and method by which its products were produced. For example, Biscotti was given a blueprint as to how World Wide configures its manufacturing facilities to produce these products.

38.    Furthermore, Terwilliger instructed Biscotti as to the proper techniques in storage, use and assembly of World Wide's products, proprietary processes developed by World Wide through considerable effort and expense. Terwilliger also showed Biscotti the procedures utilized by World Wide to track its products, and trained him on World

{14154\69301\A0105948.1}

10

Wide's quality control procedures, many of which were foreign to Biscotti because they are not used in his previous pharmacy positions.

39.    World Wide also determined that the Maynard facility was to be equipped with unique proprietary equipment for the sterilization of certain products.    This equipment, and how it functions, was a closely guarded secret within World Wide itself. World Wide strictly admonished Biscotti that this was indeed proprietary information and could not be conveyed to even other World Wide personnel, absent a "need to know."

40.    In October 2002, the Maynard facility became operational.    In November 2002, ACP manufactured its first products from the Maynard facility for beta testing.  By December 2002, the Maynard facility was in full production and shipping product to various hospitals.

41.     During his employment with ACP, Biscotti had extensive contact with many vendors and customers, and comprehensive lists of these entities were contained in ACP's computer database.

42.    As of December 31, 2002, World Wide had invested approximately $500,000 in the Maynard facility.

43.    At or about this time, World Wide, through its President, Gary Lamoureux, submitted several proposals to Biscotti whereby Biscotti would become a shareholder in ACP.  In this regard, and at considerable expense, World Wide circulated several proposals that were marked up and edited by Biscotti and his attorneys.

44.    Notwithstanding these efforts, Biscotti never signed a stockholders agreement with ACP, and never became a shareholder.

{14154\69301\A0105948.1}

11

**Biscotti Voluntarily Resigned And Set Up NCG, A World Wide Competitor**

45.    On February 5, 2004, Biscotti submitted an e-mail resignation to Lamoureux, effective on February 16, 2004.

46.    At the time of resignation, Biscotti held the position of Director of Pharmacy Operations and was the only employee of ACP who held a nuclear pharmacist license.

47.    Based on the fact that Biscotti, ACP's only registered nuclear pharmacist had resigned, World Wide was left with no choice but to close down the Maynard facility.

48.    On February 10, 2004, Terwilliger and Bruce Strawinski, World Wide's Operations Manager, made an unannounced visit to the Maynard facility for the purpose of closing down the business.

49.    Besides closing down the facility, Terwilliger and Strawinski intended to offer the remaining ACP employees jobs in World Wide's Connecticut facility.

50.    Terwilliger and Strawinski immediately took Biscotti into his office and explained the reason why they were there and asked for his cooperation.  Biscotti said that he would cooperate.  Terwilliger asked Biscotti to collect all of his personal belongings and to stack them in his office.  Biscotti informed Terwilliger that he had already removed his personal things, including computer(s) owned by him that he had been using at work.  When Terwilliger asked whether any company information had been erased or deleted from the computer(s), Biscotti responded in a cryptic manner as to whether Terwilliger thought that he [Biscotti] may be stealing information from the company.

{14154\69301\A0105948.1}

12

51.    Shortly thereafter, Terwilliger met with all the employees and discussed potential job opportunities in Connecticut. Each of the employees told Terwilliger that they would think about the offer.

52.    During the next several hours, Terwilliger and Strawinski, with the help of the other ACP employees, packed up the equipment for shipment to Connecticut. By mid-afternoon, all of the employees had left except for Biscotti and another employee. Strawinski then asked Biscotti and the other employee for their keys to the building and they turned them over and left the facility.

53.    At approximately 6:45 p.m., Terwilliger and Strawinski locked up the facility and went down to the parking lot. At that time, Strawinski made a final check with the movers to make sure that they understood the directions to World Wide's Connecticut facility. When the truck left, Strawinski decided to go up and use the restroom directly across the hall from ACP's office. As he left the restroom, he observed Biscotti inside the ACP facility. The facility had floor to ceiling glass doors and side panels. As Strawinski stood and watched, Biscotti was walking back and forth from his office and putting things, including papers, in boxes he had placed on the floor in the center of the area.

54.    After informing office security, Strawinski went back to ACP's office and watched Biscotti. He then knocked on the door, and Biscotti opened it. When Strawinski asked what he was doing there, Biscotti answered that he was getting personal items that he didn't take during the day. Strawinski informed him that he shouldn't be there as he had taken his keys and secured the facility. Biscotti replied that he would not leave and that he had every right to be there. Shortly thereafter, Biscotti left with the cardboard

{14154\69301\A0105948.1}

13

boxes. Strawinski was unable to determine what materials Biscotti removed from ACP's facility.

## Biscotti And NCG Are Competing With World Wide And ACP

55.    Shortly after Biscotti's resignation, Plaintiffs discovered that Biscotti had established a competing business.

56.    Significantly, after checking the records of the Corporate Division of the Secretary of State's Office, Plaintiffs learned that Biscotti had established a competing company, NCG, on March 5, 2004, approximately one month after he voluntarily resigned.

57.    On information and belief, since setting up NCG, Biscotti has solicited and intends to continue to solicit, Plaintiffs' customers and accounts. Moreover, Biscotti has misappropriated Plaintiffs' Confidential Information.

58.    During the last month, World Wide has been informed by several customers that Biscotti, through his new company, NCG, has offered to provide them with the exact same services and products that Plaintiffs offer.

59.    Remarkably, one of World Wide's customers, North American Scientific, Inc., received a brochure from Biscotti's new company in which he identified the exact products and services that he intends to provide, a copy of which is attached here to as Exhibit C.

60.    Incredibly, not only does Biscotti state that his new company, NCG, will provide the same technology and know-how provided to him under the NDA, but he also included several letters of recommendation from World Wide.

{14154\69301\A0105948.1}

14

61.    Due to Biscotti's behavior, which clearly violated his NDA and misapplied the trade secret and confidential information given to him by Plaintiffs, Plaintiffs initiated and filed an action in the Middlesex County Superior Court to stop the Defendants from offering to set up customers of Plaintiffs with the capacity to manufacture pre-plugged brachytherapy needles pre-loaded and sterilized in kit form utilizing the confidential and trade secret information developed by Plaintiffs and provided to Biscotti when he was their employee.

62.    However, the Defendants' responsive papers to Plaintiffs' request for preliminary relief shockingly disclose that the Defendants were not only offering services to allow customers of Plaintiffs to manufacture and create pre-plugged, pre-loaded needle kits – and thereby contributing to and/or actively inducing others to engage in such activities, in infringement of one or more claims of the '760 Patent and in violation of one or more sub-paragraphs of 35 U.S.C. §271 – but were actually purchasing pre-plugged needles and stranding equipment and utilizing the patented methods and trade secret information known to Biscotti through his employment at World Wide to manufacture pre-plugged, pre-loaded brachytherapy needles in a sterile kit form for retail sale.  In doing so, Defendants are directly infringing and/or contributing to and/or actively inducing others to engage in such activities, in infringement of one or more claims of the '760 Patent and in violation of one or more sub-paragraphs of 35 U.S.C. §271.

63.    Plaintiffs have suffered, and continue to suffer, irreparable injury as a result of Defendants' misconduct.    Unless immediately enjoined and restrained,

Defendants will continue to cause damage to Plaintiffs through harm to their goodwill, business relations and employees.

### Count I
### (Patent Infringement)

64.    Paragraphs 1 through 63 above, inclusive, are herein incorporated by reference as if fully set forth.

65.    The '760 Patent was duly and legally issued by the United States Patent and Trademark Office on April 29, 2003, naming as inventors Plaintiffs Gary A. Lamoureux and Richard A. Terwilliger. A certificate of correction to the '760 Patent was issued on November 25, 2003. (See Exhibit A.)

66.    The '760 Patent currently is, and at all relevant times in the past has been, in full force and effect.

67.    The '760 Patent is jointly owned by Plaintiffs Lamoureux and Terwilliger, and World Wide is the exclusive licensee there-under. Subsequent to the commencement of this action, it was learned that Terwilliger had purportedly assigned to IdeaMatrix an undivided interest in the '760 Patent. Upon information and belief, Terwilliger is the owner of and controls IdeaMatrix. As a nominal owner of an interest in the '760 Patent, Terwilliger, on behalf of IdeaMatrix, has consented to be joined in suits for infringement of the patent.

68.    The required statutory notice has been placed on all products manufactured and sold under the '760 Patent.

69.    Defendants, without authorization of Plaintiffs, and in this judicial district and elsewhere in the United States, are engaged in the manufacture and/or use and/or offering for sale and/or sale of pre-plugged needles and/or pre-plugged needles loaded

{14154\69301\A0105948.1}

16

with radioactive seed elements (or with stranded, linked or otherwise connected spaced seeds), and/or is contributing to and/or actively inducing others to engage in such activities in concert with it, in infringement of one or more claims of the '760 Patent and in violation of one or more sub-paragraphs of 35 U.S.C. §271.

70.    On information and belief, Defendants' infringement of the '760 Patent has been willful and deliberate.

71.    As a consequence of Defendants' acts, Defendants have caused, and are causing damage to Plaintiffs, and unless such acts are enjoined by the Court, Defendants will continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law, and for which Plaintiffs are also entitled to injunctive relief under 35 U.S.C. §283.

## Count II
### (Breach of the Non-Disclosure Agreement)

72.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 71 as if fully stated herein.

73.    World Wide has performed all conditions, covenants, and promises required to be performed by it in accordance with the terms and conditions of the NDA.

74.    As alleged above, Biscotti has breached the NDA by misappropriating Plaintiffs' Confidential Information and by organizing NCG to compete directly with Plaintiffs.

75.    As a direct and proximate result of Biscotti and NCG's actions, Plaintiffs have been and continue to suffer irreparable damage to its goodwill and Confidential Information, loss of its competitive position, and potential loss of future business, or current accounts.

{14154\69301\A0105948.1}

17

76.    Unless Biscotti is enjoined from working in a competing business, he will continue to breach the NDA.

77.    Plaintiffs' remedies at law are inadequate.

### Count III
### (Breach of the Covenant of Good Faith and Fair Dealing)

78.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 77 as if fully stated herein.

79.    Biscotti's actions, as described above, represent a breach of the implied covenant of good faith and fair dealing running in the NDA between the parties.

80.    As a direct and proximate result of Biscotti's breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged and will be irreparably harmed.

### Count IV
### (Fraud)

81.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 80 as if fully stated herein.

82.    At all times relevant herein, Biscotti made certain representations, material omissions, and promissory statements to Plaintiffs' agents, servants and employees without any present intent to comply therewith, all while attempting to induce Plaintiffs to rely thereon.

83.    As a direct and proximate result of Biscotti's misrepresentations and material omissions, Plaintiffs have suffered damages and will be irreparably harmed.

**Count V**
**(Improper Use of Trade Secrets and Confidential Business Information)**

84.     Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 83 as if fully stated herein.

85.     World Wide and Biscotti entered into an NDA pursuant to which Biscotti agreed not disclose World Wide's Confidential Information.

86.     The aforementioned Confidential Information, including, but not limited to, business strategies and manufacturing processes are not of public knowledge, are confidential to World Wide, and give World Wide an opportunity to obtain an advantage over competitors who do not know or use them.    They are considered trade secrets entitling World Wide to equitable relief for their misappropriation.

87.     The aforementioned trade secrets were disclosed to Biscotti while the parties were in a confidential relationship arising from the circumstances of their negotiations.

88.     Contrary to the terms of the NDA, on information and belief, Biscotti, through his new company, NCG, has used and disclosed Plaintiffs' Confidential Information.

89.     As a direct and proximate result of Biscotti and NCG's improper use of Plaintiffs' trade secrets and other confidential business information, Plaintiffs have been damaged and will be irreparably harmed.

**Count VI**
**(Tortious Interference With Business Relations)**

90.     Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 89 as if fully stated herein.

{14154\69301\A0105948.1}

19

91.    Through its conduct described above, Biscotti and NCG have intentionally and improperly interfered with existing contractual business relationships of Plaintiffs. Indeed, Biscotti and NCG have solicited North American Scientific, Inc., one of World Wide's largest accounts, and is also soliciting other customers of World Wide.

92.    As a direct and proximate result of Biscotti and NCG's intentional and improper interference with existing customers of Plaintiffs, Plaintiffs have been damaged and will be irreparably harmed.

### Count VII
### (Violation of Mass. Gen. L. ch. 93, §42)

93.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 91 as if fully stated herein.

94.    By his actions described above, Biscotti has misappropriated trade secrets and other Confidential Information belonging to World Wide and ACP.

95.    As a direct and proximate result of Biscotti's violation of Mass. Gen. L. ch. 93, §42, Plaintiffs have been damaged and will be irreparably harmed.

### Count VIII
### (Conversion)

96.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 95 as if fully stated herein.

97.    By his actions referenced above, another employee has wrongfully converted property belonging to ACP.

98.    As a direct and proximate result of another employee's wrongful conversion, Plaintiffs have been damaged and will be irreparably harmed.

{14154\69301\A0105948.1}

**Count IX**
**(Violation of Mass. Gen. L. ch. 93A)**

99.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 98 as if fully stated herein.

100.    Plaintiffs, at all times relevant hereto, were engaged in the conduct of trader commerce within the meaning of Mass. Gen. L. ch. 93A, §11.

101.    Defendants were and are engaged in the conduct of trade or commerce within the meaning of Mass. Gen. L. ch. 93A, §11.

102.    The acts and practices alleged above constitute unfair and/or deceptive trade practices in violation of Mass. Gen. L. ch. 93A.

103.    As a direct and approximate result of Defendants' deceptive acts or practices, Plaintiffs have suffered damages and will be irreparably harmed.

**Jury Demand**

Plaintiffs hereby demand a trial by jury on all issues and counts that are so triable.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.    Issue an Order to the Defendants requiring them to appear and show cause as to why Plaintiffs are not entitled to a preliminary injunction against the Defendants for their continued infringement, inducing of infringement, and contributing to the infringement of the '760 Patent;

B.    Issue a preliminary and permanent injunction against Defendants' continued infringement, inducing of infringement, and contributory infringement of the '760 Patent;

C.    Issue an Order temporarily and preliminarily enjoining, for a period of three (3) years from the date this Order is entered or until further Order of the Court:

1.    Anthony Biscotti, his agents, attorneys, successors and assigns, or anyone acting directly or indirectly on his behalf, from: (i) soliciting,

{14154\69301\A0105948.1}

21

contacting or accepting business from any World Wide customer or account; and (ii) using or disclosing Plaintiffs' Confidential Information;

2.    NCG, its agents, attorneys, successors and assigns, or anyone acting directly or indirectly on its behalf, from: (i) soliciting, contacting or accepting business from any World Wide customer or account; and (ii) using or disclosing Plaintiffs' Confidential Information.

D.    Issue an award of damages in favor of Plaintiffs against Defendants sufficient to compensate Plaintiffs for Defendants' infringement of the '760 Patent pursuant to 35 U.S.C. §284, and in no event less than a reasonable royalty for Defendants' use of the invention, and an assessment of prejudgment interest and post-judgment interest;

E.    Issue a finding by the Court that Defendants' infringement of the '760 Patent is willful, and an award of enhanced damages of up to three times the amount found or assessed pursuant to 35 U.S.C. §284;

F.    Issue a finding by the Court that this case is exceptional under 25 U.S.C. §285;

G.    Issue an award to Plaintiffs of their reasonable expenses, including attorneys' fees, and costs of this action;

H.    Award Plaintiffs judgment and damages sufficient to compensate Plaintiffs for Defendants' misuse of the confidential and trade secret information; and

I.    Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,
WORLD WIDE MEDICAL
TECHNOLOGIES, LLC, ADVANCED
CARE PHARMACY, INC., GARY A.
LAMOUREUX AND RICHARD A.
TERWILLIGER
By their Attorneys,

/s/ George R. Moore
George R. Moore, BBO #656102
Mark J. Sampson, BBO #552808
DEVINE, MILLIMET & BRANCH, PA
300 Brickstone Square, 9th Floor
P.O. Box 39
Andover, MA  01810
(978) 475-9100

{14154\69301\A0105948.1}

22