UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WORLD WIDE MEDICAL TECHNOLOGIES, LLC, ADVANCED CARE PHARMACY, INC. GARY A. LAMOUREUX and RICHARD A. TERWILLIGER, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHONY D. BISCOTTI and NUCLEAR CONSULTANTS GROUP, INC., <br><br> Defendants. | Docket No. 04-11619-NG |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR RULE 11 SANCTIONS

Defendants in the above-captioned matter, Anthony D. Biscotti and Nuclear Consultants Group, Inc. (the "Defendants") hereby move this Court to impose sanctions against the Plaintiffs in this action, World Wide Medical Technologies, LLC ("WW"), Advanced Care Pharmacy, Inc. ("ACP"), Gary Lamoureux and Richard A. Terwilliger (collectively the "Plaintiffs") pursuant to Federal Rule of Civil Procedure 11. As reasons therefore, the Defendants state that the Plaintiffs have failed to allege with the required degree of specificity that the Defendants have infringed on the so-called "760 Patent" and failed to conduct any patent infringement analysis prior to filing suit as required by law.

### FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts related to this action may be found in the Defendants' Counterclaims. Many additional facts set forth below are gleaned from the Affidavit of Anthony Biscotti, which Affidavit was filed in a case initially filed by ACP and WW against the Defendants in

Massachusetts Superior Court in or about July, 2004.  That Affidavit is appended hereto as Exhibit 1.

Mr. Biscotti commenced his relationship with WW as a consultant in or about April 2002.  WW engaged Mr. Biscotti as an independent contractor to direct its efforts to establish a nuclear pharmacy in Massachusetts to handle radioactive brachytherapy seeds for the treatment of prostate cancer.  During Mr. Biscotti's eight-month WW engagement, he primarily worked out of his Acton home and his duties and responsibilities centered on the establishment of the nuclear pharmacy.  Exhibit 1.  WW never allowed Mr. Biscotti access to any of its trade secrets or confidential information during his brief WW tenure; rather, all information he received from WW was familiar to Mr. Biscotti prior to his WW engagement and/or well-known in the industry.  Exhibit 1.  Mr. Biscotti commenced employment with ACP on January 1, 2003 and his title was Director of Pharmacy Operations.  Mr. Biscotti never executed a confidentiality, non-disclosure, non-solicitation, non-competition or other restrictive agreement with ACP.  Exhibit 1.

As Director of Pharmacy Operations, Mr. Biscotti oversaw the management of ACP's pharmacy and handling of brachytherapy materials.  These materials typically consisted of radioactive brachytherapy seeds to be implanted into the prostate of a patient suffering from prostate cancer by the use of a specialized, but commercially available needle.  Exhibit 1.  These seeds are often stranded together at alternating intervals (dictated by the treating physician) using commercially available materials.  The needles are "plugged" to keep the seeds from falling out of the bottom of the needle (the cannula), typically with bone wax.  At ACP's Maynard facility, Mr. Biscotti and his staff tested stranded and non-stranded seeds, loaded the seeds into ACP's pre-plugged needles and sterilized the seeds.  Exhibit 1.  They conducted quality control and ensured that the end-user specifications were met, then packaged and shipped the seeds to the

end user.  ACP's pre-plugged needle is one of several types of pre-plugged brachytherapy needles available on the commercial market and numerous non-plugged brachytherapy needles are available from several companies.  <u>Exhibit 1</u>.  The "pre-loading" of needles pre-dates ACP's creation and was used by hospitals such as Boston's Beth Israel Hospital, which developed a method for pre-loading seeds into needles with bone wax, then sterilizing the same for use in its operating rooms.  <u>Exhibit 1</u>.

During the course of 2003 Mr. Biscotti's relationship with Mr. Lamoureux became strained due, in large part, to Mr. Lamoureux's refusal to issue to Mr. Biscotti stock certificates documenting Mr. Biscotti's ownership interest in ACP.  By the end of 2003, the parties' relationship deteriorated to the breaking point.  <u>Exhibit 1</u>.  During January 2004 Mr. Lamoureux and Mr. Biscotti, through their attorneys, negotiated an agreement for the return of Mr. Biscotti's investment.  During the course of the negotiations relating to this agreement, counsel for ACP and WW confirmed to Mr. Biscotti's attorney that Mr. Biscotti was not bound by any agreement whatsoever and that ACP would require Mr. Biscotti "as a condition of continued employment to execute . . . standard documents relating to confidentiality and non-compete."  <u>Exhibit 1</u>.  Again, Mr. Biscotti never executed a confidentiality, non-disclosure, non-solicitation or non-competition agreement with ACP or WW and he resigned his employment on or about February 5, 2004.  <u>Exhibit 1</u>.

ACP shut its Massachusetts operation without notice to employees or to the Massachusetts Board of Pharmacy, as is required by law.  Mr. Biscotti took no property belonging to ACP when he left and currently possesses no ACP property.  He established a corporation called Nuclear Consultants Group, Inc. ("NCG") and began to offer consulting services upon his separation from ACP.  <u>Exhibit 1</u>.  ***While NCG certainly provides some***

*services that are competitive with ACP or WW, NCG in no way incorporates or utilizes any trade secrets of ACP or WW.* For example, while NCG can certainly provide customers with brachytherapy products, NCG does not utilize ACP's "secret" stranding techniques or any of the Plaintiffs' patented needles. NCG instead buys stranding material from other producers such as CP Medical, Inc., which has produced its own brand of stranding material for years. Exhibit 1. *NCG is not currently, and never has manufactured pre-loaded, pre-plugged brachytherapy needles*.

In fact, the Plaintiffs, in their Complaint do not allege with any specificity that the Defendants are manufacturing or selling pre-plugged, pre-loaded brachytherapy needles in a manner which violates any of their patent rights. See Complaint. *The Plaintiffs' entire patent infringement claim is premised on the fact that "one of World Wide's customers, North American Scientific, Inc., received a brochure from Biscotti's new company in which he identified the exact products and services he intends to provide."* Complaint at ¶ 57. The services offered in the brochure, however, do not remotely suggest infringement or intended infringement of the Plaintiffs' "760 Patent" -- a particular pre-plugged brachytherapy needle. Complaint, Exhibit 3. Rather, the brochure states that NCG "can work with you to add any of the following products and services: . . . sterilization and packaging of custom products." Complaint, Exhibit 3. From this innocuous marketing statement, the Plaintiffs make the incredible leap, contending that this single statement evidences an offer to provide "customers of the Plaintiffs to manufacture and create pre-plugged, pre-loaded needle kits – and thereby contributing to and/or actively inducing others to engage in such activities, in infringement of

4

one or more claims of the "760 Patent" in violation of one or more sub-paragraphs of 35 U.S.C. § 271."[1] Complaint at ¶ 60.

The Defendants have recently learned that the Plaintiff, Richard A. Terwilliger, assigned all of his rights to the '760 Patent to Ideamatrix nearly two years ago. Specifically, on December 9, 2003, Mr. Terwilliger sold, assigned, transferred and otherwise conveyed his "entire right, title and interest in and to the [the '760] PATENT PROPERTY" to Ideamatrix. See "Inventor to Corporate Assignment of Patents, Applications, and Inventions" appended hereto as Exhibit 2. The assignment specifically includes among the "PATENT PROPERTY" "the right to sue for and [sic] all claims for damages, profits or other recovery resulting from infringement." Id.

Ideamatrix is not a party to this action. It is unknown whether Ideamatrix has refused to participate in this action – perhaps out of fear of incurring Rule 11 sanctions – or whether the Plaintiffs' purposely or negligently failed to seek Ideamatrix's participation. Certainly the Plaintiffs' negligent failure to seek Ideamatrix's participation in this matter would evidence the Plaintiffs' utter lack of any infringement analysis or credible investigation into whether the Defendants have infringed on the '760 Patent.

---

[1] Several months after the Defendants commenced doing business, two of the Plaintiffs – WW and ACP -- brought legal action against Mr. Biscotti and another former ACP employee in Middlesex (Massachusetts) Superior Court in June, 2004 (the "Massachusetts Action"). The Plaintiffs' allegations in the Massachusetts Action were substantially similar to those alleged in the instant action, with the exception of the patent infringement claims. The Plaintiffs sought injunctive relief from the court in the Massachusetts Action but, after a hearing on their motion for injunctive relief – during which the court expressed skepticism regarding the Plaintiffs' claims – the Plaintiffs withdrew their motion and dismissed their Complaint. Several weeks later, the Plaintiffs filed a Complaint in this action, adding the patent infringement claims. While they filed with this Court a Motion for Injunctive Relief and Emergency Motion for Preservation of Evidence, moreover, they submitted these motions with little support and failed to press for a determination of their "emergency" motions as the months passed. The Court ultimately denied the Plaintiffs' Motion for Injunctive Relief. The Court also denied the Plaintiffs' Emergency Motion for Preservation of Evidence.

5

**LEGAL ARGUMENT**

The Court should impose Rule 11 sanctions against the Plaintiffs for their failure to conduct any good faith patent infringement analysis prior to filing suit as required by Rule 11.

I.   **Plaintiffs' Failure to Conduct Pre-Suit Investigation Requires the Imposition of Rule 11 Sanctions**

Federal Rule of Civil Procedure 11 ("Rule 11") states that "[b]y presenting to the Court . . . a pleading . . . an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*, . . . the allegations and other factual contentions have evidentiary support." Rule 11 (emphasis added). In the context of patent infringement actions, Rule 11 requires, at a minimum, "that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." Q-Pharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295, 1300-01 (Fed. Cir. 2004); accord View Eng'g, Inc. v. Robotic Vision Sys., Inc., 208 F.3d 981, 986 (Fed Cir. 2000) (Affirming the district court's imposition of Rule 11 sanctions where counsel had "performed neither a formal nor an informal analysis of any sort" and thus failed to conduct a "reasonable inquiry for the purpose of filing patent infringement claims."). "The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11." Id.; see also Q-Pharma, 360 F.3d at 1302 (Observing that "our case law makes clear that the key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis.").

The basis for this requirement is clear,

> A patent suit can be an expensive proposition. Defending against baseless claims of infringement subjects the alleged infringer to undue costs -- precisely the scenario Rule 11 contemplates. Performing a pre-filing assessment of the basis of

6

> each infringement claim is, therefore, extremely important.  In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement. Failure to do so should ordinarily result in the district court expressing its broad discretion in favor of Rule 11 sanctions, at least in the absence of a sound excuse or considerable mitigating circumstances.

Wald v. Inv. Tech. Group, Inc., 2004 U.S. Dist. LEXIS 22449 (S.D.N.Y. 2004) (quoting View Eng'g, Inc. at 986.

Here, the Plaintiffs appear to have performed no infringement analysis at all.  Their Complaint is completely bereft of any reference to any patent analysis.  The Complaint is also bereft of an allegation that the Defendants directly infringed on their alleged patent rights.  As indicated above, ***the Plaintiffs' entire patent infringement claim is premised on the fact that "one of World Wide's customers, North American Scientific, Inc., received a brochure from Biscotti's new company in which he identified the exact products and services he intends to provide."***  The services offered in the brochure do not even suggest infringement – or intended infringement – of the Defendants' '760 Patent.  Rather, the brochure states that NCG "can work with you to add any of the following products and services: . . . sterilization and packaging of custom products."  As set forth above, the Plaintiffs have based their entire patent infringement claim on this unobjectionable marketing statement, contending that this single statement evidences an offer to provide "customers of the Plaintiffs to manufacture and create pre-plugged, pre-loaded needle kits – and thereby contributing to and/or actively inducing others to engage in such activities, in infringement of one or more claims of the "760 Patent" in violation of one or more sub-paragraphs of 35 U.S.C. § 271." Complaint at ¶ 60.

Significantly, the Plaintiffs have failed to even allege that any of their customers have been aided by the Defendants in the manufacture or creation of particular pre-plugged needles

7

thereby infringing on the '760 Patent.  Indeed, such assistance from the Defendants is unnecessary as a competitor or customer need only obtain the publicly-available patent design, description and detail to create an infringing needle.  Again, ***the Plaintiffs have absolutely failed to even allege that the Defendants aided any third party in creating a product that infringes on the '760 patent.***  The Plaintiffs have, instead, based their entire claim on the Defendants' vague and innocuous marketing materials.

Courts have awarded Rule 11 sanctions in cases, such as this, in which a plaintiff, in prosecuting a patent claim, has based its pre-litigation investigation merely upon marketing materials of the alleged infringer and on the opinion of the patent holder.  The case <u>View Eng'g, Inc. v. Robotic Vision Sys., Inc.</u>, 208 F.3d 981, 986 (Fed. Cir. 2000) is instructive.  In <u>View Eng'g</u>, the United States Court of Appeals for the Federal Circuit affirmed a district court award of sanctions against a patent plaintiff that had failed to undertake the required pre-litigation investigation.  As is the case here, the only basis for the patent infringement filing was a ***mere belief of infringement*** based upon the patent holder's knowledge of his patents, the marketing and advertising material of the alleged infringer and statements made by the alleged infringer to its own customers. <u>View Eng'g</u> at 985.  Significantly, as is the case here, the patent holder in <u>View Eng'g</u> ***made no attempt to obtain and analyze the alleged infringing device***.  <u>Id</u>.  Just as the <u>View Eng'g</u> Court did, this Court should award Rule 11 sanctions against the Plaintiffs.  <u>See also</u>, <u>Network Caching Tech., LLC v. Novell, Inc.</u>, 2003 U.S. Dist. LEXIS 9881 (N.D. Cal. Mar. 21, 2003) (Although Court declines to impose Rule 11 sanctions at that juncture, it notes that merely reviewing marketing material and similar indirect "information ***fails to satisfy the pre-filing investigation requirements*** described both by <u>View Eng'g</u> and the court's previous order." <u>Id</u> at 18 (emphasis added).

8

In the case at hand, the Plaintiff's did not even obtain marketing materials with "technical discussion" nor did they obtain an allegedly infringing product.  Had they obtained an infringing product (perhaps from their customer North American Scientific, Inc.), assuming for illustration only that there were any such products, they would have then been required to "reverse engineer" or *at least* analyze the product.  See View Eng'g; Judin v. The United States and Hewlett-Packard Co, 110 F.3d 780 (Fed. Cir. 1997) (Rule 11 sanctions affirmed where plaintiff failed to analyze allegedly offending product prior to filing suit).  The Plaintiffs would then have been required to demonstrate a nexus between the Defendants' activities and the infringing product.  Id.  The Plaintiffs have utterly failed to perform any of these pre-filing activities.  The Court must award Rule 11 sanctions against the Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Rule 11 Sanctions should be allowed.

Respectfully Submitted,

ANTHONY D. BISCOTTI and
NUCLEAR CONSULTANTS
GROUP, INC.

By their attorneys,


_____/S/ John F. Tocci_____
John F. Tocci, Esq., BBO# 562139
Tocci, Goss & Lee, P.C.
35 India Street, 5th Floor
Boston, MA  02110
(617) 542-6000

Dated: December 13, 2005